CARAWAY, J.
| iThis is a real action involving the ownership of immovable property. The former owners of the property had adversely possessed the disputed tract of approximately 15 to 18 acres along with 100 additional and adjacent acres to which they held title. The former owners’ ownership of this property was conveyed in succession proceedings by two deeds to the parties’ to this action. On the strength of those deeds executed in 2002 and 2003, the parties now claim ownership of the disputed tract. From a ruling in favor of the plaintiff, the defendant now appeals. Finding error in the trial court’s ruling, we reverse and recognize the ownership of the defendant. The case is remanded to fix the boundary to the property in accordance with survey data submitted at trial.

Facts

Prior to deeds executed in 2002-2003 which prompted this lawsuit, the owners of these adjacent properties held title to the land under longstanding recorded deeds which described the following two tracts:
East Half of the Southeast Quarter (E/2 of SE/4) of Section 3, Township 16 North, Range 8 East (hereinafter the “Section 3 Tract”)
The North 15.50 chains (or 1023 feet) of the Northeast Quarter of the Northeast Quarter (NE/4 of NE/4) of Section 10, Township 16 North, Range 8 East (hereinafter the “Section 10 Tract”).
The ideal boundary between these two tracts therefore was the governmental section line between Section 3 to the north and Section 10 to the south separating the SE/4 of the SE/4 of Section 3 and the NE/4 of the NE/4 of Section 10 (hereinafter the “Ideal Boundary”).
|2The Marie Wilson Morgan family owned the 80-acre Section 3 Tract along with 20 additional and contiguous acres lying in the SW/4 of Section 2 (hereinafter collectively the “100 Acres”). The Morgan chain of title to this 100 Acres is evidenced in the record dating back to a deed in 1943 and the Morgan family’s ownership of the 100 Acres is not in dispute.
The Wilton A. Roberts family has held title to the Section 10 Tract for over 40 years. In 1964, Wilton A. Roberts, husband of Rebecca Jane Roberts, was conveyed the Section 10 Tract in a deed from Dorothy Harbour, et al. Edward W. Roberts (“Roberts”), who inherited the interests of his parents, Wilton and Rebecca, following their deaths, is now the defendant in this action.
At the heart of this property dispute is an old fence which runs from east to west *480 approximately in the middle of the Section 10 Tract. The land between the old fence north to the Ideal Boundary is the property now in dispute (hereinafter the “Disputed Tract”). The size of the Disputed Tract revealed by the survey data introduced at trial appears to be 14.36 acres but had been referred to by the parties in varying amounts as comprising up to 18 acres. The Disputed Tract is a portion of the Section 10 Tract, and is roughly described in the present judgment as follows:
[TJhat part of the Northeast Quarter, Section 10, Township 16 North, Range 8 East, lying north of the boundary fence, which fence separates the property owned by Edward Roberts (previously property of Wilton A. Roberts, et al) from the “Morgan Place”[1]
IsWhile the record does not disclose who constructed the old fence, the conflict between the two tract owners arose because of acts of adverse possession by the Morgan family extending from their Section 3 Tract into Section 10 down to the old fence. The evidence shows that even before 1964, when Wilton Roberts acquired title to the Section 10 Tract, approximately half of his land, this Disputed Tract north of the old fence, was in the possession of the Morgans. At all times, the Morgans, or their tenant farmers, actively farmed the Disputed Tract. Testimony from Alton McKeithen, previous game warden for Franklin Parish; Susan F. Turner, Mrs. Morgan’s daughter-in-law; and Harold Dean Cole, who previously hunted and farmed the Disputed Tract, consistently revealed that the fence formed the boundary line between the two properties and had done so for over thirty years. Edward Roberts even acknowledged that when he was a small child his father farmed the Disputed Tract by renting the land from the Morgans and presumably paying rent in order to do so. From these facts, the trial court determined that the Morgan family possessed the Disputed Tract for over thirty years and further found that the possession was continuous, uninterrupted, public, and unequivocal and extending up to the old fence. Roberts makes no assignment of error as to this finding, and we therefore agree with the trial court that the Morgans corporally possessed the Disputed Tract for over thirty years.
On July 29, 2002, the Succession of Marie Wilson Morgan (“the Succession”) executed a full warranty deed in favor of Loutre Land and | ^Timber Company (“Loutre”) transferring the following described tract of land situated in Franklin Parish:
The South Half of the Southwest Quarter of the Southwest Quarter (S-l/2 of SW-1/4 of SW-1/4) of Section 2, Township 16 North, Range 8 East, Franklin Parish, Louisiana, and the East Half of the Southeast Quarter (E-l/2 of SE-1/4) of Section 3, Township 16 North, Range 8 East, Franklin Parish, Louisiana, consisting of 100 acres, more or less, including all crop base acres (65.2),
“together with all rights or prescription, whether acquisitive or liberative, to which said vendor may be entitled.” This deed (hereinafter the “Loutre Deed”) was recorded on August 5, 2002, in the conveyance records of Franklin Parish. The price for this conveyance, as stipulated in the Act of Sale, was $75,000.
Subsequent to Loutre’s acquisition of the above described tract, Roberts obtained a survey which confirmed that his family’s 1964 record title did in fact include the Disputed Tract. On advise of counsel, *481 Roberts procured a quitclaim deed from the Succession (hereinafter the “Quitclaim Deed”). Daniel C. Wirtz, the Succession’s attorney, testified that he was uncertain if the Succession still maintained ownership of the Disputed Tract after its sale to Loutre. Despite his reluctance, Wirtz accepted consideration in the amount of $3,000 on the Succession’s behalf. The Quitclaim Deed was dated January 29, 2003, and recorded on February 27, 2003. It conveyed without warranty any rights, title, or interest of the Succession in the Section 10 Tract, described as follows:
Beginning at the northeast corner of Northeast Quarter of Northeast Quarter of Section 10, Township 16 North, Range 8 East, and running due west along the north line of said forty to the Northwest corner thereof, thence due south a distance of |,45.50 chains, thence due east to the eastern boundary of said forty, thence due north a distance of 15.50 chains, to the northeast corner of said forty and the point of beginning, containing 32 acres, more or less, in the Northeast Quarter of Northeast Quarter of Section 10, Township 16 North, Range 8 East.
Thus, while the description in the Quitclaim Deed is overly broad, including all of the Section 10 Tract, the portion of the tract north of the old fence, the Disputed Tract, was clearly included in the description.
In June 2003, after obtaining the Quitclaim Deed, Roberts went on the Disputed Tract and attempted to erect a new fence along.the Ideal Boundary according to the recent survey. In doing so, he crossed the existing fence and “bush hogged” a path for the new fence, destroying a number of pine seedlings previously planted by Lou-tre.
On June 30, 2003, Loutre filed suit, claiming possession for over thirty years to the Disputed Tract by virtue of tacking the possession of its ancestors in title, the Morgans. Based on this possessory interest, Loutre sought, among other things, damages for trespass and destruction of property, including damages commensurate with Louisiana’s statutory scheme relegating treble damages for destroying trees on the land of another. Roberts answered and reconvened, asserting ownership of the Disputed Tract and seeking damages.
On October 7, 2004, Loutre filed a motion for partial summary judgment, seeking a declaration that the fence constituted the boundary between the property owned by it and that owned by the Roberts. By judgment, rendered and signed on June 2, 2005, the trial court recognized Loutre as the owner of the Disputed Tract by virtue of acquisitive prescription. On a later date, June 25, 2007, the trial court further ordered, Rafter a trial on the merits, that Edward Roberts pay $15,250.00 to Loutre. Defendants appealed these judgments to this court. In Loutre Land and Timber Co. v. Roberts, 42,918 (La.App.2d Cir.4/16/08), 981 So.2d 775, writ denied, 08-1422 (La.10/31/08), 994 So.2d 535 (“hereinafter Loutre I”), this court held that genuine issues of material fact existed so as to preclude summary judgment.[2]
On remand, during a trial on the merits, the court heard testimony regarding the Morgan family’s possession of the Disputed Tract. Additionally, the court received *482 evidence concerning the two sales by the Succession to Loutre and Roberts, including evidence of the considerations paid by the parties to the Succession and the parties’ intentions concerning those deeds.
At the conclusion of trial, the trial court ruled in favor of Loutre, recognizing its ownership of the Disputed Tract. Considering the Quitclaim Deed of Roberts, the trial court expressed as follows its concerns regarding the impact upon the rule for tacking of boundary possession under Civil Code Article 794 if the Quitclaim Deed were to be given effect:
The problem I have with this situation is in my mind it would — it could set a very dangerous precedent for Louisiana property law. To allow a seller to sell to Buyer A and then find out well, wait a minute there was three extra acres stuck on that east boundary I can sell it to someone else now. I think that would cause such a tremendous upheaval in the property law in the state that there’s no way we can allow that to happen.
^Additionally, the court awarded $17,750 in damages for trespass and attorneys fees. It is from this judgment that both Loutre and Roberts now appeal.

Discussion

In its petition commencing this action, Loutre first acknowledged that Roberts was “purportedly” the “owner” of the Section 10 Tract which included the parcel of land in dispute. This was recognition of Wilton A. Roberts’s,1964 deed to the Section 10 Tract. Nevertheless, in paragraph 10 of the petition, Loutre asserted:
Defendants [Roberts] have intentionally disregarded occupational fences that have been used as boundaries for possession for more than thirty years and is hable to Loutre for trespass and intentional injury to property.
In response to Loutre’s suit, Roberts reconvened, asserting his ownership of the Disputed Tract. At the trial of this matter, prior deeds, including the parties’ recent deeds from the Succession, and the facts of the Morgan family’s lengthy adverse possession were presented as the evidence for the resolution of Loutre’s claim and Roberts’s reconventional demand.
From the allegations in the parties’ pleadings and the evidence produced at trial, this action is not a simple tort action in trespass, involving a defendant with no ownership claim or intention to possess as owner. The dispute involves “real action” claims of both parties addressed under Title II of the Special Proceedings of Book VII of the Code of Civil Procedure, whether characterized as a petitory or boundary action. Addressing such actions, Article 3654 of the Code of Civil Procedure sets the parties’ burdens of proof as follows:
IsWhen the issue of ownership of immovable property or of a real right therein is presented in an action for a declaratory judgment, or in a concursus, expropriation, or similar proceeding, or the issue of the ownership of funds deposit ed in the registry of the court and which belong to the owner of the immovable property or of the real right therein is so presented, the court shall render judgment in favor of the party:
(1) Who would be entitled to the possession of the immovable property or real right therein in a possessory action, unless the adverse party proves that he has acquired ownership from a previous owner or by acquisitive prescription; or
(2) Who proves better title to the immovable property or real right therein, when neither party would be entitled to the possession of the immovable proper *483 ty or real right therein in a possessory action.[3]
The possession of the Disputed Tract prior to the time of the deeds from the Succession in 2002-2003 is now undisput-edly established as having been in the Morgans. Their possession, however, was more than mere possession but had extended in time for over thirty years. As such, the Morgans had acquired ownership of the Disputed Tract by acquisitive prescription of thirty years prior to the execution of the two deeds of the Succession. La. C.C. art. 3486.[4] At the time of 2002-2003 deeds, the Morgans’ existing ownership did not involve a written title to the Disputed Tract or anything recorded in the public records, but nevertheless could be established, and has now been established, by evidentiary proof of facts outside the public records.
19After the Loutre Deed, Loutre continued with acts of possession over the Disputed Tract by the planting of the pine tree seedlings on the property. Thus, under the test of La. C.C.P. art. 3654(1), Roberts’s brief actions in coming on the Disputed Tract and destroying some of those seedlings precipitated this suit and placed Roberts in the position of the “adverse party.” Roberts’s burden of proof therefore for the resolution of “the issue of ownership of immovable property” in this real action was to prove that “he has acquired ownership” of the Disputed Tract “from a previous owner.”
Roberts’s claim for the ownership of the Disputed Tract rests upon the rights he purportedly received from the Succession in the Quitclaim Deed. Roberts recorded the Quitclaim Deed in the conveyance records, and the Quitclaim Deed purports to be a transfer of rights “from a previous owner” of the Disputed Tract which is fully described in the deed. The recordation of the Quitclaim Deed implicates Louisiana’s public records doctrine, which must now be reviewed for consideration of Roberts’s claim.
On the other hand, Loutre’s claim for ownership of the Disputed Tract rests upon its assertions regarding Civil Code Article 794 (hereinafter “Article 794”), which it claims operates to its benefit in a manner superior to the public records doctrine. When asked at oral argument whether the recorded deed to Loutre with its lack of any description of the Disputed Tract gave “notice to third parties that the ownership rights of the Morgans in Section 10 have been conveyed,” counsel responded as follows:
No, Sir, it does not. But that’s not the issue. The issue is possession.
| mThe “possession issue” which Loutre asserts rests on Article 794, which provides as follows:
When a party proves acquisitive prescription, the boundary shall be fixed according to limits established by prescription rather than titles. If a party and his ancestors in title possessed for thirty years without interruption, within visible bounds, more land than their title called for, the boundary shall be fixed along these bounds.
To summarize this dispute, therefore, Roberts’s claim of ownership rests upon a recorded Quitclaim Deed from “the previ *484 ous owner” specifically describing the Disputed Tract. Loutre’s claim for ownership rests upon the transfer of the Succession’s title to the 100 Acres in Sections 2 and 3 and the rights afforded Loutre under the last sentence of Article 794 for the so-called “tacking” of possession of “the previous owner” to the Disputed Tract in Section 10. This asserted clash between the public records doctrine and Article 794’s tacking rule in boundary actions requires our review of both bodies of law and their importance for the resolution of ownership disputes.
The public records doctrine as now expressed in the Civil Code’s new articles on registry provides that the rights established or created by an instrument that transfers an immovable are without effect as to a third person unless the transfer instrument is registered by recording it in the conveyance records. La. C.C. art. 3838. The Code defines a “third person” as a person who is not a party to or personally bound by an instrument. La. C.C. art. 3343. The public records doctrine therefore has been given effect to the prejudice of the acquiring party in favor of a third party where there is |nan absence of recordation of the transfer instrument to the acquiring party. Camel v. Waller, 526 So.2d 1086 (La.1988).
Louisiana’s prior statute addressing the law of registry, La. R.S. 9:2721, repealed by Act 169 of 2005, provided that “neither secret claims or equities nor other matters outside the public records shall be binding on or affect such third parties.” This rule is now reflected in the new Article 3342, effective January 1, 2006. “A party to a recorded instrument may not contradict the terms of the instrument or statements of fact it contains to the prejudice of a third person who after its recordation acquires an interest in or over the immovable to which the instrument relates.” La. C.C. art. 3342.
In Professor Redman’s discussion of Louisiana’s public records doctrine in 1965, he articulated the so-called “pure race” principle, as follows:
Since an interest is null as to third persons until recorded, among otherwise equal claimants, priority in ranking goes to the winner of the race to the public records office.
William V. Redmann, The Louisiana Law of Recordation: Some Principles and Problems, 39 Tul. L.Rev. 491 (1965). He then gives the example of a double sale or conveyance of an immovable, as follows:
If the sale from O to A is not recorded, it is not effective against third person B, whether B knew of the sale or not; if the sale from O to A is recorded, it is effective against B, whether B knew it or not. Thus, in case of either recordation or non-recordation, whether B actually knows of the sale or not has no bearing on the result.
Id. Such double sale was indeed the fact situation involved in Louisiana’s seminal public records case, McDuffie v. Walker, 125 La. 152, 51 So. 100 (1909), where the second purchaser with a recorded act of title prevailed over the first purchaser with an unrecorded deed.
A quitclaim deed at common law is recognized in the civil law as an assignment of rights without warranty. See La. C.C. art. 2502, comment (c). A quitclaim deed has been held to be a deed transla-tive of title. Bolding v. Eason Oil Co., 248 La. 269, 178 So.2d 246 (1965); Board of Com’rs for Lafourche Basin Levee Dist. v. Elmer, 268 So.2d 274 (La.App. 4th Cir.1972), writ denied, 263 La. 613, 268 So.2d 675 (La.1972), citing Bolding v. Eason Oil Co., 248 La. 269, 178 So.2d 246 (1965). In other words, the ownership to immovable property may be as effectually transferred *485 by quitclaim as by any other form of conveyance. Waterman v. Tidewater Associated Oil Co., 213 La. 588, 35 So.2d 225 (La.1947). Furthermore, although such a deed conveys only such title or interest that the grantor had at the time it is given, it is sufficient to support a plea of acquisitive prescription. Id. These rulings have now been included in the revision of the law of Sale, and new Article 2502 of the Civil Code provides:
Such a transfer does not give rise to a presumption of bad faith on the part of the transferee and is just title for purposes of acquisitive prescription.
From these principles, it follows that a quitclaim deed would be a sufficient transfer of rights so that the public records doctrine provision of Civil Code Article 3338(1) applies to the recorded quitclaim deed.
Critical to the public records doctrine and the notice which is given by a recorded instrument is the description of the immovable which is the subject of such instrument. Louisiana jurisprudence has not established 1 ^precise criteria to determine what description in the public records is sufficient to place third persons on notice, and such determination is to be made on a case by case basis. Nitro Energy, L.L.C. v. Nelson Energy, Inc., 45,201 (La.App.2d Cir.4/14/10), 34 So.3d 524, quoting Consolidated Ass’n of Planters of Louisiana v. Mason, 24 La. Ann. 518 (1872). In Hargrove v. Hodge, 9 La.App. 434, 121 So. 224, 225 (La.App. 2d Cir.1928), it was determined that the property description in the instrument must be such that the property intended to be conveyed could be located and identified, and the general rule is that the description must fully appear within the four corners of the instrument itself, or that the instrument should refer to some map, plat, or deed as a part of the description, so that the same may be clear. It is not permissible to indulge in speculation when interpreting deeds to real property. Id.
In reference to the sectional subdivision of public lands in the official plats of the governmental surveys, the courts have said that the “description [of a governmental quarter/quarter section] is mathematically certain and calls for no extrinsic evidence to explain the intention of the parties as to the tract intended to be conveyed.” Haas v. Fontenot, 132 La. 812, 61 So. 831 (1913). On the other hand, certain omnibus or similar descriptions have been uniformly held not to put third parties on notice of the location and identity of the property which is the subject of an instrument. Williams v. Bowie Lumber Co., 214 La. 750, 38 So.2d 729 (1948) (It seems to be settled now by the jurisprudence in Louisiana that such a vague and indefinite description, in an instrument purporting to convey title to real estate, as all h4of the land owned by the seller in a named parish, is not sufficiently specific to give notice to third parties thereafter dealing with the seller.) Blevins v. Manufacturers Record Pub. Co., 235 La. 708, 105 So.2d 392 (1957) (A sale by given bounds conveys only the property within such bounds, and acreage designations appended to such specific descriptions do not enlarge or restrict the grant described by the specific bounds.) W.B. Thompson & Co. v. McNair, 199 La. 918, 7 So.2d 184 (1942) (Innocent third purchasers cannot be held to the necessity of ascertaining whether or not the land remaining to their vendors is equal in area to the body of land purchased.)
Considering the two property descriptions contained in the deeds conveyed by the Succession, we agree with Loutre’s counsel that the Loutre Deed does not describe any lands in Section 10 so as to place a third party on notice that Loutre *486 had acquired from the Succession any interest in the Disputed Tract. The Loutre Deed only describes, by referencing the governmental survey, the 100 Acres in Sections 2 and 3. Additionally, the deed’s omnibus expression of a transfer of “all rights of prescription, whether acquisitive or liberative, to which vendor may be entitled,” does not direct a third party viewing the Loutre Deed to the Disputed Tract where the Morgans’ right of ownership by thirty-years acquisitive prescription had accrued. Nevertheless, Loutre’s claim for ownership is now argued to rest on something beyond a recorded written conveyance to Loutre with a description of the Disputed Tract. Loutre claims rights afforded it under Article 794.
11fiArticle 794 is contained in Book II of the Civil Code which deals with “The Different Modifications of Ownership.” One of those modifications concerns “Boundaries” between contiguous lands, Book II, Title VI, and the “Effect of Titles, Prescription or Possession” in a boundary dispute as addressed in Title VI, Chapter 2 of Book II. La. C.C. arts. 784 et seq.
Article 794 is best understood, therefore, by reviewing the first three articles of Chapter 2 dealing with the boundary action, which provide:
La. C.C. art. 792. Fixing of boundary according to ownership or possession
The court shall fix the boundary according to the ownership of the parties; if neither party proves ownership, the boundary shall be fixed according to limits established by possession.
La. C.C. art. 793. Determination of ownership according to titles
When both parties rely on titles only, the boundary shall be fixed according to titles. When the parties trace their titles to a common author preference shall be given to the more ancient title.
La. C.C. art. 794. Determination of ownership according to prescription
When a party proves acquisitive prescription, the boundary shall be fixed according to limits established by prescription rather than titles. If a party and his ancestors in title possessed for thirty years without interruption, within visible bounds, more land than their title called for, the boundary shall be fixed along these bounds.
These articles concern the boundary action where the court considers recorded titles and possible acts of adverse possession to “fix the boundary according to the ownership of the parties.” The boundary is the line of |10separation between contiguous lands. La. C.C. art. 784. Therefore, the conflict is between one landowner against an adjacent neighbor. As in this case, the conflict may involve one party and the facts of possession concerning the ancestors in his chain of title on one side of an ideal boundary against the neighboring party and the facts concerning her ancestors in her title chain. The two ancestral title chains therefore usually describe a common or ideal boundary, as in this case.
Turning specifically to Article 794 and its final sentence, the rule calls the court to credit the proof by one of the adjacent landowners of the acts of adverse possession for over 30 years which occur on land extending beyond the ideal boundary to a “visible bound” (hereinafter the “Extra Land”). According to Article 794, that landowner, who makes the claim of ownership to the Extra Land attributable to adverse possession of over 30 years, need not have been in possession himself for 30 years but may rely upon or “tack” the possession of his ancestors in title. Moreover, if those “ancestors in title” executed previous deeds or transfers to the tract, *487 describing land only to the ideal boundary and not including the Extra Land, the lack of a descriptive and juridical link or “particular title” to the Extra Land does not prevent the current landowner’s proof of acquisitive prescription through evidence of the combined acts of possession of himself and all his ancestors. Such proof by the tacking of possession allows for a judicial recognition of the ownership of the Extra Land from which the court shall fix the new boundary. On the whole, the final sentence of | ^Article 794 provides a litigant an evidentiary proof allowance in the trial of a boundary action.
The important benefit of Article 794’s boundary tacking, therefore, is that the established visible bound that has existed for over 30 years becomes the new boundary superseding the ideal boundary expressed in the adjacent landowners’ titles. The Extra Land becomes owned by the landowner who has used and employed that land through acts of corporeal possession up to the visible bound even though his use and adverse possession extended beyond his title. Finally, an erroneously fixed visible boundary may in many instances only involve a few feet and a minimal quantity of land so that neither of the adjoining landowners may have been alerted to the problem over a lengthy passage of time. This means that from the prior transfers of the land the party in possession of the Extra Land may not have had it transferred to him from his ancestors in title by a particular title with an appropriate metes and bounds description of the Extra Land.[5] Therefore, upon its employment for proof in the boundary action, the boundary tacking rule of Article 794 operates as an exception to the general rule of Civil Code Article 3441[6] which otherwise requires a “particular title” for the transfer of | ^possession. Brown v. Wood, 451 So.2d 569 (La.App. 2d Cir.1984), writ denied, 452 So.2d 1176 (La.1984).[7]
*488 Nevertheless, there are significant aspects of this boundary dispute which are not specifically addressed in Article 794. Most importantly, the “ancestors in title” expression in the article concerns the predecessors/ transferors of the landowner/litigant who is asserting ownership to the Extra Land derived in part from the acts of corporeal possession of those predecessors who had also previously possessed beyond their title to the visible bound. Thus, Loutre’s “ancestor in title” for purposes of Article 794 is the Succession which conveyed by particular title only the lands in Sections 2 and 3. Nevertheless, the benefit of the boundary tacking rule of Article 794 is now claimed by Loutre as attendant to the Succession’s sale extending to Loutre the Succession’s rights in the Extra Land, which in this case is the Disputed Tract. The peculiarity of this case, however, is that the Succession is also the “ancestor in title" to Roberts. Clearly, under Article 794, when a landowner/litigant asserts his ancestor in title’s adverse 119possession, that “ancestor in title” is not understood as also an “ancestor in title” to the neighboring and opposing landowner. The Succession’s unusual dual role as an “ancestor in title,” or ak owner who purportedly conveyed the same land to both adjacent landowner claimants immediately before this boundary dispute, suggests that something other -than Article 794 must be considered for the ranking of these competing transfers[8] of rights in the immovable from the same transferor.
Second, Article 794 addresses the effect of the combined possessions of the party claimant in the boundary action and his “ancestors in title” when cumulatively amounting to thirty years of uninterrupted possession. In this case, Loutre did not need to tack the mere possession of the Morgans to its own possession to effect an accrual of the thirty years for acquisitive prescription through their combined adverse possession. The Morgans alone had amassed thirty years of possession and thus ownership through acquisitive prescription at the time of the sale to Loutre. In that sense, a deed by particular title describing the Disputed Tract from the Succession to Loutre would have conveyed ownership to the Disputed Tract, and with *489 12nrecordation of such title, Loutre could have resolved this boundary dispute in its favor without the need for the possession tacking rule of Article 794.[9]
In summary, Article 794 allows for a special mode of proof for the determination of thirty-year acquisitive prescription, and thus ownership, in a boundary action between neighboring landowners. The “ancestor in title” of one party whose prior acts of adverse possession serve to contribute to that party’s proof of acquisitive prescription is generally understood not to also be the “ancestor in title” of the neighboring and opposing landowner. However, if two successive sales are made by that ancestor in title after the time that the adverse possession of the ancestor has occurred, such double sale in our opinion brings into play the application of the public records doctrine to determine which of the two transferees shall prevail. The fact that Article 794 is a special evidentiary rule for proof in a court proceeding to establish acquisitive prescription does not mean that the policy principles for the transfer of ownership of an immovable under the public records doctrine are in conflict with Article 794 or, in any way, superseded by Article 794.[10]
121The interplay between the public records doctrine and Article 794 in this case was clearly illuminated in a hypothetical illustration upon which the trial court remarked in the parties’ oral argument, as follows:
Obviously, as Mr. Hoychick pointed out if the Morgan Estate had sold Mr. Ed [Roberts] that 14.6 acres before it sold to Loutre ... that would be a legitimate and valid sale of ... a property acquired ... by acquisitive prescription.
This illustration correctly acknowledges that the Succession could have intended to sell the Disputed Tract and the 100 Acres separately to different parties. If so, the deeds in such illustration would describe the separate properties in exactly the same manner as the separate deeds in this case — the Quitclaim Deed and the Loutre Deed — describing respectively the 14.6 acres in Section 10 and the 100 Acres in Sections 2 and 3. Therefore, since the recorded descriptions reflect on the face of each deed separate transfers of differently described immovables, it does not matter which deed occurred first or was recorded first. Moreover, it is clear under the public records doctrine that if a deed to Lou-tre had described all 114.6 acres (the 100 Acres and the Disputed Tract) but not been recorded, a second sale by the Succession of the 14.6 acres to Roberts gains the protection of the public records doctrine after its recordation; and the prior transfer to Loutre is “without effect” as to the rights acquired by Roberts. La. C.C. art. 3838. From yet another perspective, *490 after the recordation of the Loutre Deed which occurred first in this case, Roberts as a third party to the Loutre Deed may consider that the Succession intended only to sell the 100 Acres as identified in that deed and to retain the 14.6-acre Disputed Tract. If a | ^contrary intent existed between the Succession and Loutre, a third party seeking to purchase the Disputed Tract was not bound by such secret equity between the parties that was not expressed by the inclusion of a description of the Disputed Tract in the recorded Loutre Deed. La. C.C. art. 3342.
This does not mean that Loutre was unprotected at the time of its purchase nor that it could not have brought a boundary action against Roberts and asserted the acquisitive prescription obtained by acts of the Morgan family over the Disputed Tract. Clearly, a complete assessment of the lands involved in the proposed sale from the Succession to Loutre would have revealed the sizable tract of land of the Morgan farm that extended into Section 10. As shown by the survey data presented at trial, the Disputed Tract is obviously not in Sections 2 and 3. The southern boundary of the 100 Acres stretches east to west one-half mile running in a straight line along the south section fines for Sections 2 and 3. Yet, the Disputed Tract extends some 400 feet off of that fine to the south. The Loutre Deed neglected to describe this unusually large tract extending beyond the Ideal Boundary into the Section 10 Tract over which the Roberts family held record title. Thus, the first protection available to Loutre was the execution and recordation of a deed accurately describing the entire 115-acre tract which it claims to have purchased from the Succession.
Nevertheless, even with the inadequate description contained in the Loutre Deed, Loutre could have immediately instituted a boundary, action and proven the acquisitive prescription by which its ancestor in title had acquired ownership of the Disputed Tract. Such suit would have allowed | gjLoutre to establish the Morgans’ ownership of the Disputed Tract and itself as successor to the Morgans. With the re-cordation of a notice of lis pendens of the real action under La. C.C.P. arts. 3751, et seq., such action would also prevent the possibility of the double sale by the Succession which later occurred. In proving the acquisitive prescription of its predecessors, the Morgans, Loutre would be meeting the burden of proof in the boundary action of the first sentence of Article 794 without the need for the tacking rule of its second sentence for the accumulation of a thirty-year period of possession between multiple parties.
In conclusion, the facts of this boundary dispute are unusual. The misplaced boundary is not one which merely strayed slightly off course from the ideal boundary called for in the title deeds of the two adjacent landowners. In such case, double sales involving a minimal strip and quantity of land would not be expected. The misplaced boundary in this case is some 400 feet south of the Ideal Boundary. The attorney representing the Succession was apparently unclear whether the sizable 15 to 18-acre tract in Section 10 had been sold to Loutre. So the Succession sold again. This is therefore not a case of the proof of an ownership change caused by acquisitive prescription along a boundary line where Article 794 resolves the dispute. This is a case of the transfer of that ownership by parties with two competing deeds from the same prior owner of the immovable where the public records doctrine must govern. Under our law of registry, Roberts’s deed was the superior deed recorded in the | ^conveyance records, and he therefore proved that he acquired ownership from the previous owner.

*491
Conclusion

For the above reasons, we reverse the trial court’s judgment. It is hereby ordered, adjudged and decreed that Edward W. Roberts is the owner of the Disputed Tract which is described as that portion of the Northeast Quarter of the Northeast Quarter of Section 10, Township 16 North, Range 8 East, lying north of the old fence shown on the two surveys presented at trial. Although the surveys of the parties appear to coincide and place the Ideal Boundary in approximately the same location, there is apparently no visible boundary along the section line between Sections 8 and 10. Therefore, the case is remanded to the trial court to fix the boundary visibly by reference to markers on the ground between the parties’ adjacent tracts in accordance with the two surveys and with Roberts’s ownership as recognized herein. Additionally, we find nothing in the record to support Roberts’s claim for damages and that claim is dismissed.
Costs of appeal are assessed to Loutre Land and Timber Company.
REVERSED AND REMANDED.
BROWN, C.J., concurs with written reasons.
DREW, J., concurs for the reasons assigned by Judge BROWN.
MOORE, J., dissents and with written reasons.

. This description describing the entire NE/4 of Section 10 is misleadingly broad, as the old fence in dispute only extends east and west through the NE/4 of the NE/4.

. We reject Loutre’s present assertions in brief that the plurality opinion of four judges in Loutre I decided in any manner legal issues in the case so that the law of case doctrine has application to this appeal. In considering the two undisputed deeds executed by the Succession, the concurring opinion did express the legal conclusion that "Roberts has the best recorded title from a common author.”

. This twofold proof burden of Article 3654 would be the same for the boundary action, as Article 3693 of the Code of Civil Procedure directs the court to fix the boundary “in accordance with the ownership or possession of the parties.”

. La. C.C. art. 3486. Immovables; prescription of thirty years.
Ownership and other real rights in immov-ables may be acquired by the prescription of thirty years without the need of just title or possession in good faith.

. On the other hand, if the misplaced visible boundary involves more than a few feet, runs a course totally different from the ideal boundary, or involves a large expanse of Extra Land as a possessory encroachment upon a neighboring tract of land, it becomes more difficult to understand why the chain of transfers by the parties with adverse possession does not include in their transfers the Extra Land by a metes and bounds description. As emphasized by this court in Loutre I, there arises a question of the intent of the parties to such transfer, or as in this case, whether the Succession intended to transfer only 100 acres for $750 per acre or 115 acres. On remand, the evidence showed that the parties intended a $750 per acre price, yet the Succession was only paid $75,000 by Loutre.

. Article 3441 provides that "[pjossession is transferable by universal title or by particular title." La. C.C. art. 3441. Thus, in a case where a party has obtained the right to possess (La. C.C. art. 3422) through adequate acts of corporeal possession over the land of another and that party has no title to adjacent lands, the party must appropriately describe in an instrument the land in his possession in order to transfer his right to possess by "particular title.” This principle is the general rule for the transfer and tacking of possession in a non-boundary setting. See, La. C.C. art. 3442. Likewise, if that same party's possession had extended in time for over thirty years so that he had acquired ownership by acquisitive prescription, the party’s transfer of that ownership would require a "particular title” describing the property which would then allow the transferee the protection of the public records doctrine by the recordation of that title.

.Article 794’s beneficial effect was memorably expressed by the Louisiana Supreme Court in Opdenwyer v. Brown, 155 La. 617, 626-627, 99 So. 482 (1924), where the court explained the source articles to present Articles 794 and 3441, holding that boundary tacking is an exception to the general rule, as follows:
... [I]f perchance it should be discovered that Bienville had misread the plan of his engineer and located his "place d’armes” a few hundred feet higher up, or lower down, *488 the Mississippi than such plan calls for, there is no title to a foot of land in the city of New Orleans, which would not call for correction; and since the land which each successive purchaser took possession of would not be the same land which his title called for, it follows (if we accept the Le Rosen Case) that he could not "tack” onto his own possession that of his supposed author, and thus could not protect his boundaries, by the prescription of 30 years. That would be against all common sense; and law is common sense, as far as legislators, courts and men of law will let it remain so.

. Loutre has argued to this court that Brown v. Wood, supra, presents "almost exactly the same facts” as the present dispute. This is incorrect. In that case the defendants, the Woods, had possessed the extra land beyond that called for in their title. Their title was acquired from Oliveaux 26 years prior to the suit, and Oliveaux also had previously been in possession of the extra land for over four years. Therefore, utilizing Article 794, the Woods proved that they and their ancestor in title had possessed the extra land for over 30 years, and their ownership was recognized by this court. Additionally, immediately prior to the suit, Oliveaux had executed a second transfer, a quitclaim deed, to the Woods specifically describing the extra land. The quitclaim was unnecessary for the ruling since the Woods had acquired the extra land by virtue of the operation of the tacking rule of Article 794 and the earlier deed from Oli-veaux. Likewise, unlike the present case, Oli-veaux made no quitclaim transfer to the other party in the boundary dispute, the Browns. The only case Loutre cites with apparently similar facts is McIlwain v. Manville Forest Products Corp., 499 So.2d 1138 (La.App. 2d Cir.1986). However, in that ruling the public record doctrine was never addressed by the court.

. This is not to say, as explained below, that Loutre was not entitled to have immediately instituted a boundary action against Roberts after its acquisition from the Succession and before the Quitclaim Deed, to have asserted the ownership of the Disputed Tract as transferred to Loutre by the Succession, and to have had the court fix the boundary line between the two tracts.

. The trial court’s concern expressed in its oral ruling, quoted above, is a concern that sellers sometimes sell an immovable twice because of unscrupulous conduct, error, or some other cause. This is what the public records doctrine addresses; yet such double dealing, particularly misconduct or fraud, is not the subject matter of Article 794. A seller, who intends to sell all of his rights in a tract within existing visible bounds and who warrants that sale, would generally be expected to understand that he is breaching that sales contract and its warranties by executing a second sale. Yet, when the rare double sale occurs, the public records doctrine will have application for the determination of the competing claims of the vendees.